CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 3 1 2009

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| NANCY E. BREWSTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 7:08cv384 |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) By: Michael F. Urbanski |
| Commissioner of Social Security, | ) United States Magistrate Judge |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Nancy E. Brewster ("Brewster") brought this action for review of the Commissioner of Social Security's ("Commissioner's") decision denying her claim for disability insurance benefits and supplemental security income benefits under the Social Security Act (the "Act"). On appeal, Brewster argues that the Commissioner erred by giving insufficient weight to the opinions of treating physicians, by failing to accommodate Brewster's functional limitations and by finding plaintiff's testimony lacked credibility. Having reviewed the record, the undersigned finds the Administrative Law Judge's ("ALJ") decision is supported by substantial evidence and **RECOMMENDS** that the Commissioner's decision be **AFFIRMED**.

### I.

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual

findings only to establish that they are supported by substantial evidence, we also must assure that his ultimate conclusions are legally correct." <u>Myers v. Califano</u>, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a <u>de novo</u> review of the Commissioner's decision nor re-weigh the evidence of record. <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. <u>See Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. <u>Smith v. Chater</u>, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. <u>Perales</u>, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); <u>Perales</u>, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." <u>Walls v. Barnhart</u>, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. <u>Heckler v. Campbell</u>, 461 U.S. 458, 460-62 (1983); <u>Johnson v. Barnhart</u>, 434 F.3d 650, 654 n.1 (4th Cir.

2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II.

Brewster was born in 1954 (Administrative Record ("R.") 46), and at the time of the Commissioner's decision was considered a "person closely approaching advanced age" under the Act. 20 C.F.R. §§ 404.1563(c), 416.963(b). Brewster holds a G.E.D. and has past relevant work as a packer at Bacova Guild in Low Moor, Virginia. (R. 37.) She had previously worked as a cashier and stocker in a convenience store. (R. 38.) Additionally, Brewster is listed as the caretaker for her disabled husband by the U.S. Department of Veterans Affairs ("VA"). (R. 286.)

Brewster alleges a disability onset date of July 7, 2006, (R. 13), claiming that the following conditions limited her ability to work: fibromyalgia, fatigue, arthritis, left knee and hip

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. §§ 404.1529(a), 416.929(a).

pain, high blood pressure, difficulty with heat, depression and headaches.[2] (R. 124.) Brewster additionally alleged that after a couple of hours of standing she encountered great pain. (R. 124.)

Shortly after the alleged disability onset date, on August 30, 2006, Brewster completed a Function Report. (R. 144-51.) In the report she wrote that she cares for her husband, bathing him, cooking for him, doing his laundry, taking him to the doctor, dressing him and "help[ing] him with everything." (R. 145.) She also noted that she would walk her dogs, "when I can[,] even if I feel bad." (R. 145.) Brewster wrote that she made three simple meals a day, with a complete supper when she felt up to it. (R. 146.) Though she could no longer mow, she cleaned daily and did laundry every two or three days. (R. 146.) Brewster also stated that she did her own shopping for groceries and clothes, driving herself in a car. (R. 147.) She wrote that she did not receive any help - paid or unpaid - in caring for her husband or her animals. (R. 145.) She additionally noted that she was in pain and that her muscles stayed stiff, making daily tasks such as dressing and bathing take longer. (R. 145.) Her pain additionally barred her from taking part in drawing, bowling or softball, and she had cut back on social outings because of her pain and associated depression. (R. 148-49.)

Brewster's application for benefits was rejected by the Commissioner initially and again upon reconsideration. (R. 68, 76.) An administrative hearing was convened before an ALJ on January 10, 2008. (R. 13.) At that time, Brewster testified that she was four feet six inches tall and weighed around 195 pounds. (R. 47-48.) She stated that she had trouble walking and a hard time going up steps. (R. 43.) She stated that she occasionally wore an elastic brace on her left knee. (R. 40.) She also noted that she believed she had depression, though she was not currently seeing a counselor and was not on medication. (R. 41-42.) Brewster stated that she could only stand for thirty minutes before she had to move around. (R. 43.) She also testified that she

---

[2] Fibromyalgia is "pain and stiffness in the muscles and joints that is either diffuse or has multiple trigger points." Dorland's Illustrated Medical Dictionary 697 (30th ed. 2003).

found it hard to sit and stand. (R. 42.) Brewster stated that she could drive for thirty to forty-five minutes at a time. (R. 45.) Brewster was not on any medication for the pain, because she said she didn't like the side effects. (R. 55.)

Brewster also noted that she was the care giver for her husband, who was on oxygen and used a walker. (R. 51.) She said that she helped dress her husband, gave him sponge bathes (R. 51), did laundry three times a week and grocery shopped twice a month. (R. 52.) She also sometimes helped him out of bed. (R. 57.) In contrast to her prior statements, Brewster testified that her sons helped her bathe her husband and that she had not bathed her husband in the last two years. (R. 50-51.) She also testified that she did not walk her dog. (R. 54.)

A vocational expert, J. Herbert Paris, testified at the administrative hearing. (R. 59.) Paris said that the care Brewster provided for her husband, as described at the hearing, would be classified as being at the light exertional level. (R. 62.) Paris further testified that doing things like giving her husband a bath would be medium heavy or heavy lifting. (R. 62.) The ALJ asked the vocational expert:

> Let's assume you're dealing with a person who can do light work, lift, carry 20 pounds occasionally, 10 pounds frequently, stand and walk about 6 hours in an 8-hour day, sit about 6. Push-pull limited, except for the lifting and carrying restrictions. Frequent climbing stairs and ramps, other postural activities occasionally. Climbing ladders, balancing, stooping, kneeling, crouching, crawling. Could such a person do the Claimant's past work as actually performed?

(R. 63.) The vocational expert opined no, but that a person with such limitations could do the job of a cashier in the national economy. (R. 63-64.) The ALJ asked if such work could be low stress. (R. 64.) The vocational expert said yes, that such work could be low stress, "basically, simple work." (R. 64.)

The ALJ denied Brewster's request for benefits. (R. 10-13.) First, he found that Brewster had not engaged in substantial gainful activity since the alleged onset date of her

disability, but found that she had earnings from short term employment that were "inconsistent

with her allegations of complete debility." (R. 15-16.)    The ALJ also found that Brewster had

acted as the caretaker for her disabled husband since the alleged onset date. (R. 15.) Second, in

determining whether Brewster was disabled under the Act, the ALJ found that:

> claimant experiences tenderness in several joints, due to fibromyalgia
> syndrome; that she has osteoarthritis of the left hip, left knee and
> bilateral hands as evidenced by findings on diagnostic testing; that
> she underwent a left knee arthroscopy in July 2007; and that she has
> a depressive disorder and an anxiety disorder, for which she has been
> mainly treated by her primary care physician. . . . These impairments
> are severe as they limit her mobility, ability to lift and carry heavy
> objects, her ability to perform complex/detailed tasks in a high stress
> environment, and her ability to perform postural activities on a
> continuous basis.

(R. at 16.)[3] However, with respect to the third step of the determination as to whether Brewster

qualified for benefits, the ALJ found that such impairments do not meet or medically equal one

of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R.

§ 404.1520(d), 404.1525 and 404.1526). (R. 16-17.)  The ALJ based his decision upon the

review and decision of State Disability Determination Service ("DDS") Physicians, the records

submitted subsequent to the DDS Physicians' review, reports of the treating physicians, records

from psychologists and the ALJ's own review of the records. (R. 16.)  In particular, the ALJ

noted that "[n]o treating or examining physician or psychologist has identified medical signs or

findings that meet or medically equal the requirements of any section of Appendix 1." (R. 16.)

The ALJ also found that Brewster has the RFC to:

> perform simple, low stress work at the light exertional level (lift or
> carry 20 pounds occasionally and 10 pounds frequently, stand or
> walk about 6 hours in an 8-hour workday, and sit about 6 hours in an
> 8-hour workday), which does not require more than frequent

---

[3] Osteoarthritis is "a noninflammatory degenerative joint disease seen mainly in older persons, characterized by
degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane. It
is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity."
Dorland's Illustrated Medical Dictionary 1333 (30th ed. 2003).

climbing of stairs/ramps or more than occasional climbing of
ladders/ropes/scaffolds, balancing, stooping, kneeling [,] crouching
and crawling.

(R. 17-18.) The ALJ found that Brewster's subjective reports of impairment were not

corroborated by the record. (R. 18-24.) The ALJ wrote, "[a]fter considering the evidence of

record, the undersigned finds that the claimant's medically determinable impairments could

reasonably be expected to generally produce the alleged symptoms, but that the claimant's

statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely credible." (R. 23.) Additionally, the ALJ noted that Brewster had given inconsistent

testimony regarding her alleged weight gain, her doctors' advice regarding elevating her feet to

heart level and the level of care that Brewster provided to her husband. (R. 23.) The ALJ found

that Brewster did possess some limitations, but "the totality of the evidence fails to substantiate

that her limitations are of the degree and intensity alleged and that they are of a nature to

preclude her from performing basic work activities, at least at the limited light exertional level."

(R. 23-24.)

The ALJ specifically noted that he was rejecting the opinions of treating physicians, Dr.

Mowery and Dr. Lemmer, because "they appear to be more based on the claimant's reported

symptoms and limitations, rather than on objective findings and diagnostic test results; both

doctors adopted an advocacy role early on and were either unaware of, or chose to ignore, her

significant caretaker duties." (R. 24.) The ALJ adopted the opinions of the DDS Physicians:

because they are consistent with the other credible evidence of
record, particularly in light of the claimant's ability to provide
caretaker services to her husband, including helping him in and out
of bed, helping him get dressed, preparing his meals, and helping
give him a sponge bath, act ivities which the vocational expert
classified as being performed at the light exertional level.

(R. 24.)

7

With regard to the fourth and fifth steps of the analysis, the ALJ concluded that Brewster is able to perform past relevant work as a cashier. (R. 24.) The ALJ noted that when Brewster worked as a cashier, she had performed shelving which could be treated as medium exertional work. (R. 23-24.) However, based on the testimony of a vocational expert, the ALJ found that cashier work at the national level was the light exertional level, and that as such, the claimant could not be classified disabled. (R. 25.) On June 12, 2008, the Appeals Council denied plaintiff's request for review. (R. 1.)

## III.

Brewster's hip problems were first brought to light on July 19, 2004, when Brewster visited Dr. John Lewis, complaining of pain in her left hip that was bad when she stood, and pain in her right hip when sitting. (R. 240.) An x-ray found that Brewster had "several pelvic phleboliths" as well as "[d]egenerative spurring" in the spine and "degenerative sclerosis [in the] right sacroiliac joint."[4] (R. 239.) Dr. Lewis stated that his impression was that Brewster had "[s]light progressive mild multilevel degenerative disc disease" and "minor trochanteric spurring."[5] (R. 226.)

Brewster returned to Dr. Lewis ten times during 2005 regarding pain in her hip and knee. (R. 214, 215, 218, 220-25, 228, 230-38.) In April, 2005, the doctors again took lab tests of Brewster. (R. 233-237.) When Brewster visited the doctor's office in late April, 2005, Dr. Lewis noted no gross change in her symptoms. (R. 232.) On May 4, 2005, Brewster visited the doctor and reported no changes in motor strength. (R. 231.) On May 11, 2005, the doctor again recorded that Brewster felt worse but there were no gross changes in motor strength. (R. 230.)

---

[4] A phlebolith is an unusual deposit in the body. Dorland's Illustrated Medical Dictionary 1423 (30th ed. 2003). Sclerosis is hardening of an area, often from inflammation, increased connective tissue or disease. Id.

[5] The trochanter refers to the area below the femur. Dorland's Illustrated Medical Dictionary 1953 (30th ed. 2003).

Additionally, the doctor found no symptoms of burning, tingling, weakness, tremors, atrophy or rigidity. (R. 230.)

Brewster underwent a variety of evaluations during the remainder of 2005. On June 1, 2005, Brewster wore a Holter Monitor to check her heart for palpitations (R. 229.) On September 1, 2005, Brewster was evaluated by Dr. Parviz Sadjadi because of her complaints of leg pain. (R. 191.) Dr. Sadjadi's evaluation was essentially normal. He found a lower bilateral extremity peripheral arterial exam to be normal. (R. 191.) He also found the veins of her lower extremities to be normal. (R. 192.) He found her left hip join to be normal, though he did find "minimal trochanteric spurring, [with] no change since 1-13-05." (R. 193.) Dr. Sadjadi further found a normal CT scan of Brewster's abdomen and pelvis. (R. 194.)

Brewster again visited Dr. Lewis on September 8, 2005. (R. 223.) She reported pain in her thigh and leg. (R. 223.) Dr. Lewis put together a pain treatment plan that alleviated Brewster's pain on the date of treatment. (R. 228.) Brewster visited Dr. Lewis four days later, reporting that her pain was a nine on a scale of ten, with pain occasionally as bad as a ten out of ten and occasionally as a low as a six out of ten. (R. 222.) She was again treated for her pain and records reflect that the treatment alleviated her pain. (R. 228.) Seven days later, Brewster visited Dr. Lewis again. She reported back and pelvic pain, pressure, bloating, and frequent urination. (R. 220.) She was prescribed Cipro and Pyrodur. (R. 220.)

On October 3, 2005, Brewster wrote Dr. Lewis a letter requesting help in completing records for the Family and Medical Leave Act ("FMLA"). (R. 16.) Brewster reported that Human Resources at her employment had gotten stricter and required doctor's notation of flare-ups of problems. (R. 216.) She stated that she missed work one or two days a week "because my body just can't take but so much from the lifting & kneeling, bending, twisting [and] moving constantly . . . ." (R. 216.) "Can you state that I have flare up with my left knee, left leg, left

9

hip[;] I have high blood pressure, fibromyalgia arthritis, osteoarthritis, lower back flare ups (I

stay nauseated)[.] I now have constant hot flashes and every 2 or 3 days[.] I[']m so wore out &

feel weak & I hurt, I can't work." (R. 216.)  She also stated, "I have days[,] Dr. Lewis[,] that I

have to keep active to keep from hurting & so I can sleep." (R. 217.)

   During 2006, Brewster again returned to Dr. Lewis but also began seeing a

rheumatologist, Dr. Lemmer. (R. 204.)  Seven months after requesting that the FMLA form be

completed, Brewster returned to Dr. Lewis in May of 2006 regarding her hip.[6] (R. 328.)  She

reported pain her in left hip and leg as well as burning sensations on both sides of her knee.

(R. 209.)  On June 7, 2006, Brewster visited Dr. Lewis again, complaining of pain in her knee

and swelling. (R. 208.)  Dr. Lewis recommended that she ice the knee. (R. 208.)

   Six days after the alleged date of disability onset, Brewster visited Dr. Lewis again

regarding pain in the knee, swelling and fatigue. (R. 206.)  Dr. Lewis reported that Brewster said

that she was not sure she could continue her work. (R. 206.)  Dr. Lewis noted that Brewster had

"multiple tender points in her thoracic and lumbar spine with areas of spasm and edema . . . ."[7]

(R. 206.)  He also noted swelling her in left knee and a diminished range of motion. (R. 206.)

He observed some atrophy, but no tremors or rigidity. (R. 206.)  Brewster was given two weeks

off to rest up, as well as a brace to wear. (R. 206-07.)  Dr. Lewis prescribed Brewster Zoloft, for

depression, Ambien CR and Naproxen. (R. 206-07.)  He additionally referred her to a urologist

for chronic hematuria. (R. 207.)

   On July 19, 2006, Brewster completed a patient medical history indicating extreme pain

(ten of ten), in her hands, abdomen, legs, back and arms. (R. 334-35.)  Dr. Lewis saw Brewster

again on July 25, 2006. (R. 204.)  At that time she was reported to have a lot of pain and "does

---

[6] She had seen Dr. Lewis twice in November, 2005 regarding a problematic toe nail. (R. 214-15.)

[7] Edema is "the presence of abnormally large amounts of fluid in the intercellular tissues spaces of the body . . . ."
Dorland's Illustrated Medical Dictionary 589 (30th ed. 2003).

10

not bend over very well and has a lot of pain in her low back when she twists and turns. She is very fatigued and diffusely in pain." (R. 204.) Dr. Lewis ordered an MRI and noted that he had advised her to stay home from work until she could see Dr. Lemmer. (R. 204.) However, the doctor who read the MRI, Bruce Banning, only noted mild and minimal issues. First, he noted that Brewster had mild spurring. (R. 202.) He stated that the "[h]ip joint is well maintained," and that "[d]egenerative sclerosis" was on the right joint. He additionally noted "pelvis phleboliths." (R. 202.) With regard to the lumbar spine, Dr. Banning noted "mild multilevel degenerative disc changes" and "no subluxation," i.e., no dislocation. (R. 203.) Dr. Banning also reported "minimal thoraculumbar dextroscoliosis" and "[n]o fracture."[8] (R. 203.) He again observed that there was "degenerative sclerosis." (R. 203.)

Additionally, on August 4, 2006, Brewster returned to Allegheny Regional Hospital for additional testing. (R. 199-201.) Again, objective testing noted only mild to moderate issues. Dr. May Ella Zelenik wrote a report on the tests and noted that with regard to Brewster's complaint of pain her left femur, that the femur was "radiologically normal" and "[t]here is no explanation for patient complaint of pain." (R. 199.) With regard to Brewster's complaint of pain in her left knee, Dr. Zelenik observed "moderate medial knee joint space narrowing," "mild spurring", "[s]mall knee joint accumulation" and "[n]o significant degenerative spurring and no erosive change." (R. 200.) Finally, with regard to Brewster's complaints of pain in her hands, Dr. Zelenick reported "[m]ild to moderate degenerative arthritis . . . ." (R. 201.)

After the testing, Brewster visited Dr. Lemmer. (R. 279.) Dr. Lemmer made an assessment listing nineteen items, including osteoarthritis of the right knee and small joints of the hand, fibromyalgia, hypertension, and anxious depression. (R. 280-81.) Dr. Lemmer told Brewster to "avoid excessive standing and walking and try to lose weight." (R. 281.) Dr.

---

[8] Thoraculumbar dextroscoliosis refers to side to side curvature of certain areas of the spine. Dorland's Illustrated Medical Dictionary 505, 1669 (30th ed. 2003).

Lemmer additionally instructed Brewster to use Glucoasmine and Chondriotin, and take part in water aerobics, massage, heat and stretching. (R. 281.) At this time, he did not suggest a long term absence from work, but rather instructed her to stay off work for slightly less than a month. (R. 281.) He additional prescribed Zanaflex and Ultram. (R. 281.)

Brewster followed up her visit to Dr. Lemmer with neuro musculoskeletal and osteopathic structural exams with Dr. Lewis in August of 2006, and an additional visit to Dr. Lemmer in September, 2006. (R. 197-98.) During the September visit, Dr. Lemmer repeated part of his diagnosis from before, specifically osteoarthritis of the left knee and fingers, myofascial pain syndrome, chronic low back pain, anxiety, depression and elevated blood pressure. (R. 276.) Dr. Lemmer extended the period for which Brewster was to stay out of work to December 6, 2006. (R. 277.)

During September of 2006, Dr. Richard Surrusco, a DDS physician, completed a Physical Residual Functional Capacity Assessment. (R. 247-53.) He opined that plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for a total of six hours in an eight hour workday, sit about six hours in an eight hour work day and push or pull without limitations. (R. 248.) He additionally opined that she could climb a ramp or stairs occasionally. (R. 249.) Dr. Surrusco based his conclusions on the facts that Brewster cared for herself and her husband, was able to drive a car and related fairly well to others. (R. 252.) He noted that she didn't require an assistive device to walk. (R. 252.) He stated that "[t]he treatment for her Fibromyalgia, Osteoarthrosis and Essential hypertension has been essentially routine and conservative in nature." (R. 252.) Dr. Surrusco stated that Brewster was partially credible, based on her statements regarding her activities and function, as well as her medical history and activities of daily living statement. (R. 252.) Dr. Robert McGuffin, a

12

second DDS physician, also reviewed Brewster's medical history and reached the same conclusions. (R. 311-17.)

With regard to Brewster's mental health claims, Dr. Richard Milan completed a psychiatric review. (R 254-66). He opined that Brewster lacked a severe mental impairment, and that her limitations were physical. (R. 266.) Dr. Carol Kovalchick also opined that Brewster's mental limitations were not severe. (R. 293-307.)

In October of 2006, Brewster visited the Valley Rehabilitation Center, seeing Dr. Deborah Mowery for the first time. (R. 330.) Dr. Mowery noted that Brewster was "in no acute distress" and found polyarticular osteoarthritis, probable CTS, sleep cycle disfunction, fibromyalgia and depression. (R. 331.) Dr. Mowery wrote in a letter to Dr. Lewis, "I will support this lady for long-term disability and given her advanced arthritis, I do not see that she is appropriate for any gainful employment. She is having difficulty with any overhead activity, prolonged sitting or standing, and lifting greater than 10 pounds." (R. 332.) Dr. Mowery prescribed Lortab and Feldene. (R. 332.)

In December, 2006, Brewster returned to Dr. Lemmer. She reported that her pain was a ten out of ten, and that the injection into the knee had not helped her. (R. 274-75.) Dr. Lemmer recommended that she receive a consultation regarding potential arthroscopic surgery on her knee. (R. 274.) Later in December, doctors located a cyst on Brewster's ovary. (R. 324.) Four days later, Brewster visited Dr. Kirtley. (R. 268.) He noted that she was "pleasant" and "in no physical distress." (R. 268.) Dr. Kirtley additionally stated that Brewster had an "[e]xtensive array of symptoms, which cannot be attributed to one primary problem." (R. 268.) He ordered a variety of tests. (R. 268.)

Brewster returned to Dr. Lemmer's office on December 19, 2006, reporting that her pain was worse. (R. 270.) Dr. Lemmer then completed a disability form for her disability insurance

13

carrier, noting osteoarthritis in the knees and fingers and fibromyalgia. (R. 271.) He acknowledged that he had not treated Brewster prior to this episode, and noted restrictions for work including no lifting of twenty pounds, no bending, no standing and no repetitive movement of the arms and legs. (R. 271.) He noted the same restrictions at home. (R. 271.) He additionally stated that she would not be able to return to work because of these limitations because he "doubt[ed] [that] these limitations would be possible at [her] workplace." (R. 271.) On the Physical Ability Assessment Form, Dr. Lemmer stated that Brewster was limited in a variety of facets, including being limited to occasional sitting, standing, walking, reaching, lifting, fine manipulation and grasping with both hands. (R. 272.) He also stated that Brewster could only occasionally lift or carry of less than twenty pounds and could not lift or carry over twenty pounds. (R. 272.) The form required that Dr. Lemmer "[c]heck [boxes] if supported by objective findings." (R. 272.) Rather than complete this portion of the form, Dr. Lemmer wrote "[w]hat is objective" and stated that "H & [illegible] support these conclusions." (R. 272.)

On January 11, 2007, CIGNA Group Insurance granted Brewster's claim for long term disability benefits. (R. 172.) About a month later, on February 2, 2007, the Virginia Department of Rehabilitative Services, through Dr. James Worth, administered a mental status interview. (R. 285-92.) The interview notes reflect that Brewster walked with a limp. (R. 285.) Dr. Worth wrote that Brewster reported sometimes being unable to get up by nine a.m. in the morning and at times needed to take naps during the day. (R. 286.) Brewster told Dr. Worth that her husband was disabled and that "'[h]e needs help getting dressed and bathing. He just can't get around.'" (R. 286.) The report also noted that Brewster is recognized by the VA as the care giver for her husband. (R. 286.) At the mental health interview, Brewster stated that she believed that she was depressed as a younger woman, and had recently heard a voice in the middle of the night. (R. 289.) Brewster indicated that she had gained weight and frequently had a depressed attitude.

14

(R. 290.) Additionally, she indicated occasional panic attacks, though she was still able to go to crowded places such as Wal-Mart. (R. 290.) Dr. Worth indicated that Brewster may have a panic disorder as well as moderate depression. (R. 291.) Dr. Worth concluded that Brewster could perform some work, stating that "her ability to perform her duties consistently and maintain regular work attendance may be negatively affected but not precluded by her psychiatric problems. She may need somewhat more special attention from a supervisor than the typical employee." (R. 292.) Additionally, he concluded that "[s]he is more vulnerable than the average worker to the ordinary stresses of a competitive work environment." (R. 292.)

Brewster continued to see Dr. Mowery in February and March of 2007. (R. 321, 323.) Later, in June, 2007, she was examined by Dr. James A. McCoig at the Allegheny Regional Hospital. (R. 355.) He diagnosed moderate degenerative arthritis in the joint and knee. (R. 355.) He noted that Brewster lacked atrophy or deformity but observed that the knee was swollen. (R. 356.) He wanted to consider surgery for the knee, but was cautious about such an approach because of the lack of localization of the pain. (R. 356-57.)

Seven months after her last visit with Dr. Lemmer, Brewster returned for a visit on July 12, 2007. (R. 389.) He indicated that Brewster would follow up with her orthopedist regarding potential surgery. (R. 389.) During the summer months she had a variety of visits with Drs. Lemmer and McCoig that included receiving injections into the knee. (R. 352, 389, 394.) On July 19, 2007, Dr. McCoig had extensive conversations with Brewster regarding whether to operate on her knee. (R. 351.) He indicated that he believed she suffered from a torn meniscus, diffuse pain that he could not explain and early arthritic changes. (R. 351.)

On July 20, 2007, Dr. McCoig performed an athroscope of the knee and abrasion chondroplast of the medial femoral and tibial condyles. (R. 348-49, 380-82.) Dr. McCoig noted a tear of the meniscus and as well as moderate osteoarthritis. (R. 380.) He also found bone on

15

bone changes in the knee during surgery. (R. 380.) Following surgery, her knee healed well. (R. 346-47.) Dr. McCoig ordered that her knee continue to be aspirated in the future. (R. 346.) In the two months after her follow up evaluation she continued to check in with Allegheny Regional Hospital. (R. 361-378.) Her physical therapy evaluation report noted that Brewster walked with a limp. (R. 375.)

## IV.

Brewster challenges the ALJ's decision on three grounds: first she argues that the ALJ erred in rejecting the opinions of treating physicians, Dr. Lemmer and Dr. Mowery ("the treating physicians"). Second, Brewster argues that the ALJ failed to sufficiently evaluate Dr. Worth's opinion, while also failing to explain the weight accorded to Dr. Worth. Finally, Brewster challenges the ALJ's finding that Brewster's testimony lacked credibility.

## A.

Brewster argues that the evaluations of the treating physicians, Dr. Lemmer and Dr. Mowery, were not accorded sufficient weight by the ALJ. As previously discussed, in Section II supra, the ALJ specifically rejected the opinions of the treating physicians because he concluded that they were based on claimant's subjective statements rather than objective findings and the because the ALJ determined that the treating physicians acted as advocates for plaintiff.

The ALJ is required to analyze every medical opinion received and determine the weight to give to such an opinion in making a disability determination. 20 C.F.R. §§ 404.1527(d), 416.927(d) (hereinafter "C.F.R. Factors"). A treating physician's opinion is to be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) ("[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations...."); Social Security Ruling ("SSR") 96-2p.

The ALJ is to consider a number of factors, including whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record and whether the physician is a specialist. 20 C.F.R. §§ 404.1527(d), 416.927(d). A treating physician's opinion cannot be rejected absent "persuasive contrary evidence," Mastro, 270 F.3d at 178, and the ALJ must provide his reasons for giving a treating physician's opinion certain weight or explain why he discounted a physician's opinion. 20 C.F.R. § 404.1527(d)(2), 416.927(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); SSR 96-2p ("[T]he notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."); see also Kratzer v. Astrue, No. 5:07cv00047, 2008 WL 936753, at *7 (W.D. Va. 2008) (noting the ALJ is expressly obligated to explain the consideration given to his opinions). In this case, the ALJ's decision to reject opinions of the treating physicians is supported by persuasive evidence.

In analyzing the C.F.R. Factors with regard to Dr. Lemmer, factors supporting greater weight are his status as a treating specialist with an on-going relationship during 2006-07. (R. 270-84, 389.) However, these factors are outweighed by the lack of diagnostic and clinical support for Dr. Lemmer's opinion, as well as the opinion's inconsistency with other portions of the record. The Administrative Record indicates that Dr. Lemmer examined Brewster five times, completing a Disability Management/Medical Request Form during the fourth visit. (R. 270-84, 389.)

During the first visit, Dr. Lemmer analyzed laboratory data, stating that radiographs of the left knee showed "moderate" narrowing of the joint space and "mild" osteophytosis. (R. 280.) He additionally stated that a radiograph of the left hip showed "minimal" osteophytosis and "no definite" narrowing of the joint space. (R. 280.) At that time, Dr. Lemmer assessed Brewster as having osteoarthritis of the right knee and small joints of the hand, diffuse myalgias consistent with fibromyalgia, anxious depression, left hip pain due to trochanteric bursitis and less likely early osteoarthritis, chronic low back pain, hypertension and other mild syndromes. (R. 280-81.) Dr. Lemmer advised Brewster to avoid excessive standing and prescribed Zanaflex and Ultrum. (R. 281.) Interestingly, he did not indicate at that time that Brewster had osteoarthritis in the left knee - the knee where she claimed to have greater pain. (R. 280.) Brewster's second visit noted that Brewster reported worsening pain and this time suggested that Brewster had osteoarthritis of the left knee, chronic low back pain, anxious depression, elevated blood pressure and myofascial pain syndrome. (R. 276.) Additionally, he noted that Brewster requested addition medical leave, a request he granted. (R. 277.) Dr. Lemmer's assessment of Brewster's problems did not materially change in her subsequent visits. (R. 274, 389.) Dr. Lemmer's notes do not document medical conditions reflective of total

18

disability. Rather, his descriptions of her physical problems consistently document "mild" and "moderate" problems.

Additionally, Dr. Lemmer's advice to Brewster is not indicative of severe problems. He told Brewster to avoid "excessive" standing and walking. (R. 281.) This does not provide an objective basis for the more stringent limitations Dr. Lemmer attested to in the CIGNA disability form that imposed more rigorous limitations on Brewster. (R. 271-72.) On that form, Dr. Lemmer limited Brewster from lifting, bending, standing, walking or repetitious movements with the arm and leg, (R. 271), limitations which do not appear in his medical records. When asked on the CIGNA disability form to note if the limitations were supported by objective findings, Dr. Lemmer failed to check any boxes. (R. 272.) Instead, he wrote "What is objective? H & [illegible] support this conclusion." (R. 272.) At the conclusion of this report, Dr. Lemmer noted that "only intermittent, sedentary, nonrepetitive work would be tolerated." (R. 213.)

The extent of Brewster's limitations noted by Dr. Lemmer do not find support in other portions of the Administrative Record. Though Dr. Lemmer indicated that Brewster suffered from debilitating pain, Brewster testified at the administrative hearing that she was not on any medication for pain. (R. 55.) She did not walk with an assistive device. (R. 252.) Further, the medical records, including the statements of physicians not relied upon by Brewster, fail to support Dr. Lemmer's conclusions. Physicians who evaluated Brewster or her tests (other than those identified as treating physicians by the plaintiff) were unable to pinpoint causes for Brewster's self-reported symptoms. Upon seeing Dr. Kirtley, Brewster was described as "pleasant" and "in no physical distress." (R. 268.) Dr. Kirtley was also unable to pinpoint a cause for the problems Brewster described, noting that she had an "[e]xtensive array of symptoms, which cannot be attributed to one primary problem." (R. 268.) This sentiment

19

echoed a statement of Dr. May Ella Zelenick, who analyzed test results for Brewster in August, 2006. (R. 199-201.) As to plaintiff's pain around the femur, Dr. Zelenick opined that "[t]here is no explanation for patient complaint of pain." (R. 199.) Dr. Bruce Banning said that Brewster's left "[h]ip joint is well maintained." (R. 202.) Dr. McCoig, who recommended surgery, described Brewster's arthritis as "moderate" and was unable to pinpoint causes for her pain outside of a torn meniscus and early arthritic changes. (R. 351, 355.) Moreover, DDS physicians who reviewed Brewster's medical records characterized the treatment plan prescribed by doctors as "essentially routine and conservative in nature." (R. 252, 316.) Indeed, the DDS agency physicians found Brewster's subjective statements regarding her pain, the basis for Dr. Lemmer's conclusions, to be only partially credible. (R. 252, 317.)

Additionally, as is discussed in Section IV.C, infra, the record contains information that contradicted Brewster's descriptions of her own pain and functions. This information allowed the ALJ to determine that Brewster was not fully credible in her testimony at the hearing. Thus, to the degree that Dr. Lemmer's opinion was based on Brewster's own description of her symptoms, the ALJ was justified in declining to accept Dr. Lemmer's opinion at face value. Therefore, the record contained persuasive evidence that contradicted the sweeping disability assessment provided by Dr. Lemmer, and, supports the ALJ's decision to reject Dr. Lemmer's opinions.

The ALJ was similarly justified in setting aside Dr. Mowery's opinion as to Brewster's state. The regulatory factors that weigh in favor of crediting Dr. Mowery's opinion are that Dr. Mowery is a specialist and treated Brewster during 2006 and 2007. (R. 319-23, 326-27, 330-33.) Early in her relationship with Brewster, Dr. Mowery wrote, "I will support this lady for long-term disability and given her advanced arthritis, I do not see that she is appropriate for any gainful employment. She is having difficulty with any overhead activity, prolonged sitting or

20

standing, and lifting greater than 10 pounds." (R. 332.) Much of that statement appears to be based upon Brewster's description of her medical history, rather than on the results of physical examination. This is bolstered by Dr. Mowery's mild description of Brewster's physical ailments. Dr. Mowery noted that Brewster was "in no acute distress." (R. 331.) She found tenderness over much of Brewster's leg, but noted no muscle atrophy and found normal muscle bulk and tone. (R. 331.) She found Brewster's range of function for her shoulders to be normal. (R. 331.) Thus, Dr. Mowery's statements, taken in conjunction with her conservative treatment plan for Brewster and her lack of medical findings, provide basis for the ALJ's conclusion that she acted as an advocate for disability status. Finally, as explained above, the bulk of the Administrative Record fails to support Dr. Mowery's opinion regarding Brewster's disability. The opinions of other doctors indicate that Brewster's physical problems were not broad enough to support her alleged disability. Objective testing consistently revealed only mild to moderate issues, inconsistent both with Brewster's complaints of pain and Dr. Lemmer and Dr. Mowery's disability opinions. The ALJ did not err in disregarding the disability opinions of the treating physicians as the record contains persuasive contradictory evidence, including their own treatment notes, along with the objective test results and records of Drs. Kirtley, Banning, McCoig and Zelenick.

## B.

Second, Brewster argues that the ALJ erred by not including limitations to accommodate Brewster's alleged mental impairments in her RFC and did not sufficiently discuss the opinion of a psychiatric consultant, Dr. James Worth. Specifically, Dr. Worth diagnosed plaintiff with a major depressive disorder, a panic disorder and assessed plaintiff as having a GAF of 51.[9]

---

[9] The Global Assessment of Functioning, or GAF, scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic And Statistical Manual Of Mental Disorders Fourth Edition 32 (American Psychiatric Association 1994) [hereinafter DSM-IV]. A GAF of 51-
(continued...)

21

(R. 291.) He concluded that this would challenge, but not preclude plaintiff, in the workplace. (R. 292.)

The ALJ clearly considered the opinion of Dr. Worth. He discussed the Dr. Worth's findings in his opinion. (R. 22-23.) At the administrative hearing, the ALJ included in his hypothetical to the vocational expert the requirement that Brewster's work be limited to simple, non-stressful work. (R. 64.) Thus, the ALJ does not appear to have rejected the opinion of Dr. Worth. Rather, the undersigned finds that Dr. Worth's opinion was taken into account by the ALJ in determining whether a job that the plaintiff could fill is present in the national economy.

## C.

Finally, plaintiff challenges the ALJ's finding that Brewster was less than fully credible in describing her pain and her activities. When faced with conflicting evidence contained in the record, it is the duty of the ALJ to fact-find and to resolve any inconsistencies between a claimant's alleged symptoms and her ability to work. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); accord Melvin v. Astrue, No. 606cv32, 2007 WL 1960600, at *1 (W.D. Va. July 5, 2007). Accordingly, the ALJ is not required to accept Brewster's testimony that she is totally disabled by virtue of chronic pain; rather the ALJ must instead determine through an examination of the objective medical record whether Brewster has proven an underlying impairment that could reasonably be expected to produce the symptoms alleged. See Craig v. Chater, 76 F.3d 585, 592-94 (4th Cir. 1996) (stating the objective medical evidence must corroborate "not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers."). A claimant's statements alone are not enough to establish a physical or mental impairment. 20 C.F.R. § 416.928(a). Subjective evidence cannot take

---

[9](...continued)
60 indicates than an individual has "[m]oderate symptoms . . . OR moderate difficulty in social, occupational or school functioning . . ." Id.

precedence over objective medical evidence or the lack thereof. Craig, 76 F.3d at 592 (quoting Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986)). The ALJ must determine whether Brewster's testimony about her symptoms is credible in light of the entire record. Credibility determinations are in the province of the ALJ, and courts normally ought not interfere with those determinations. See Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989); Melvin, 2007 WL 1960600, at *1; SSR 95-5p.

Inconsistencies in Brewster's testimony required the ALJ to question her credibility. Brewster's testimony at the administrative hearing is undermined by her prior statements in a Function Report completed in October, 2006. For example, in the Function Report completed well prior to the administrative hearing, Brewster stated that she bathed her husband. (R. 145.) She additionally indicated that she did not receive any help, paid or unpaid, in doing so. (R. 145.) In contrast, at the administrative hearing she stated that she could not bathe her husband alone and that her sons came to help with bathing. (R. 20-21.) Similarly, Brewster's testimony at the administrative hearing suggested that she had more limited functioning than she attested to in the Function Report. For example, Brewster's testimony at the hearing indicated that she was very limited in her ability to move around, stating that she sometimes had to scoot her leg with her body. (R. 43.) She also stated that she could not take a dog for a walk. (R. 54.) However, in the Function Report, Brewster noted that she would walk her dogs. (R. 145.) At the hearing, Brewster stated she had pain after standing for thirty minutes, while she had previously indicated she could stand for a couple of hours before such pain arose. (R. 43, 124.) Given Brewster's prior statements about her ability to function, the ALJ possessed persuasive evidence to allow him to question Brewster's credibility.[10] Brewster's credibility is also

---

[10] Plaintiff argues in particular that the ALJ should not have challenged Brewster's credibility based on inconsistent statements regarding plaintiff's weight. The record regarding Brewster's weight over time is unclear. However, the undersigned need not reach this ground, because the ALJ based his credibility determination upon multiple factors, in

(continued...)

undermined by the consistently mild to moderate findings of objective testing. Additionally, Brewster testified that she took part in activities that undercut her claims of debilitating pain. She indicated that she gave her husband sponge baths, helped her husband out of bed, went to grocery shop, cooked and cleaned. (R. 51, 52, 57.) She additionally stated that she could drive thirty to forty-five minutes. (R. 45.) Even accounting for plaintiff's equivocal testimony that such activities took her longer because of her pain, the undersigned believes that the ALJ did not err in concluding that such activity was inconsistent with plaintiff's self-reported pain and limitations. An ALJ may use as grounds for a finding of no disability that a claimant's self-reported activities are inconsistent with alleged disability. Gross v. Heckler, 785 F.2d at 1166.

Finally, Brewster's self-reported pain and limitations are not supported by objective medical findings, as explained in the analysis of the treating physicians' opinions, supra, Section IV.A. Brewster's objective test results consistently returned mild to moderate findings and her condition was treated conservatively. As such, the objective testing and treatment are not indicative of the type of pain or limitations she reported. Credibility determinations are more the province of the ALJ, than the undersigned. Given the objective medical evidence on the records which failed to support and in some cases called into question Brewster's testimony, and given Brewster's own inconsistent statements, there is no cause for the undersigned to disturb the ALJ's credibility finding.

## V.

At the end of the day, it is not the province of the reviewing court to make a disability determination. It is the court's role to determine whether the Commissioner's decision is supported by substantial evidence, and, in this case, substantial evidence supports the ALJ's

---

[10](...continued)
particular the lack of objective medical evidence supporting Brewster's statements regarding her pain and limitations, as well as Brewster's other inconsistent statements. (R. 23.) There is more than enough evidence on the records to affirm the ALJ's credibility finding without resolving the issue of weight.

opinion. In recommending that the final decision of the Commissioner be affirmed, the court does not suggest that Brewster is free of all distress. The objective medical record simply fails to document the existence of any physical and/or mental conditions which would reasonably be expected to result in total disability from all forms of substantial gainful employment. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating Brewster's claim for benefits and in determining that her physical and mental impairments would not prevent her from performing any work. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. Accordingly, the undersigned concludes that the Commissioner's decision ought to be affirmed and the defendant's motion for summary judgment **GRANTED**.

The Clerk is directed to transmit the record in this case to Samuel G. Wilson, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

Enter this 31st day of July, 2009.

Michael F. Urbanski
United States Magistrate Judge